UNITED STATES DISTRICT COURT
DISTRICT OF SOUTH DAKOTA
NORTHERN DIVISION

**FILED**
SEP 05 2017


CLERK

| | |
|---|---|
| SDIF LIMITED PARTNERSHIP 2, a South Dakota Limited Partnership;<br><br>Plaintiff,<br>vs.<br><br>TENTEXKOTA, LLC, a South Dakota Limited Liability Company; W. KENNETH ALPHIN, TIMOTHY J. CONRAD, MICHAEL R. GUSTAFSON, GEORGE D. MITCHELL, DALE MORRIS, MARC W. OSWALD, RONALD W. WHEELER, and DWIGHT P. WILES,<br><br>Defendants and<br>Third Party Plaintiffs,<br>vs.<br><br>JOOP BOLLEN, SDRC, INC., SD INVESTMENT FUND LLC2, and JOHN DOE 1-75,<br><br>Third Party Defendants | 17-CV-01002-CBK<br><br>ORDER ON MOTIONS |

## BACKGROUND

This lawsuit arises out of the U.S. Citizenship and Immigration Service's ("USCIS") EB-5 Lawful Permanent Resident Visa Program established by the Immigration Act of 1990, Pub. L. 101-649 §121, 104 Stat 4978, codified at 8 U.S.C. § 1153(b)(5).[1] The EB-5 program, as relevant to this litigation, allows alien entrepreneurs (and their spouses and unmarried children under age 21) to receive permanent resident status upon the investment of at least $500,000 to create at least ten full-time jobs in South Dakota.

---

[1] Section 1153 sets forth the law of preference allocation for family based (set forth in subsection (a)), employment based (set forth in subsection (b)), and diversity based (set forth in subsection (c)) immigrant visas. The fifth category of employment based visas are for qualified immigrants seeking to enter the United States for the purpose of engaging in a new commercial enterprise, creating new full-time employment. Thus, the visas are dubbed EB-5 visas. 8 U.S.C. § 1153(b)(5)(A).

One method for immigrant investors to qualify for an EB-5 visa was to pool their capital in a "regional center" – defined as "any economic unit, public or private, which is involved with the promotion of economic growth, including . . . job creation, and increased domestic capital investment" – approved by the USCIS to administer EB-5 investments. 8 C.F.R. §§ 204.6(e) and (m)(3). A regional center is essentially an entity that receives special designation from USCIS to administer foreign investments by those seeking EB-5 visas.

The South Dakota International Business Institute/Dairy Economic Development Program ("SDIBI") was formed in 1994 in an effort to increase opportunities for international exports of agricultural products from South Dakota. Third Party Defendant Joop Bollen was hired as the director of that state agency with offices in Pierre. Later, the program moved to the campus of Northern State University (NSU) in Aberdeen, South Dakota. Either when SDIBI was initially formed or sometime thereafter, the Governor's Office of Economic Development ("GOED") and Northern State University signed a contract formalizing SDIBI's role in the activities of the GOED. According to Mr. Bollen, the GOED would fund the program at the University and Mr. Bollen was a salaried employee of the University.

At some point during the late Governor Bill Janklow's second eight year term, he asked SDIBI to develop a program that would attract foreign investment to the State of South Dakota. SDIBI filed an application for EB-5 regional center designation in 2004. Matter of SDRC Certification of Immigrant Investor Program Office Decision Benefit: Regional Center Designation, 2017 WL 1133342 (March 15, 2017).

> USCIS granted that application in 2004. Although not strictly a governmental office, the purpose of the SDIBI was to support the South Dakota Department of Tourism and State Development (DTSD) in facilitating and enhancing international trade and investment in the state. To this effect, SDIBI received a portion of its funding from DTSD, which itself was associated with the office of the Governor of South Dakota.

*Id.* According to the federal Web-site, SDIBI was and is the only regional center approved by the USCIS in South Dakota. https://www.uscis.gov/working-united-states/ permanent workers/ employment-based-immigration-fifth-preference-eb-5/immigrant-investor-regional-centers (visited August 25, 2017). This is incorrect since the federal agency has approved a change to SDRC, Inc. as the regional center. This may show the danger of relying on federal government Web-sites.

2

The SDIBI regional center was initially authorized to attract immigrant investor capital into twelve counties in eastern South Dakota for dairy farm and heifer ranch operations. In December 2004, SDIBI requested approval from USCIS to expand its geographic area to cover an additional 33 counties in eastern South Dakota, to revise its business plan to allow for pooled investments through limited partnerships, and to eliminate SDIBI's self-imposed minimum of 51% alien investor ownership in newly established operations. Those amendments were approved by the USCIS in June 2005. In December 2005, USCIS approved a second amendment to SDIBI's business plan to, *inter alia*, include meat and dairy processing operations and cattle feedlots.

Initially, either the GOED or the South Dakota Department of Agriculture would contact SDIBI recommending a project in which the state was interested. Bollen would forward the project's contact information to the Hanul Professional Law Corp. in Los Angeles, California. That law firm would, at least in theory, conduct a due diligence inquiry into the proposed project and decide if the project was appropriate for the law firm's investor-clients. In South Dakota, those investors were typically from Korea. Hanul would prepare and distribute offering memorandum to market and promote the EB-5 projects to prospective investors. Hanul also acted as the immigration attorneys for the investors, preparing and submitting the necessary immigration paperwork to obtain the visas. SDIBI did not have any contracts with Hanul nor did SDIBI receive any funds in connection with its efforts in attracting foreign investments. SDIBI was never a legal entity and was "just a name," according to Mr. Bollen.

Between 2004 and 2008, EB-5 investment projects included the Northern Beef Packing plant near Aberdeen and the Dakota Provisions turkey processing plant near Huron, South Dakota. Apparently, by 2008, SDIBI's EB-5 efforts had stalled and there were concerns that Hanul and others were not accurately vetting proposed projects to ensure their long-term viability. SDIBI and SDRC entered into a memorandum of understanding on May 1, 2008, to advise the USCIS that a new entity was involved in the operational aspects of the regional center. Mr. Bollen signed on behalf of SDIBI and Mr. Park signed on behalf of SDRC.

> Because of the awkward organizational framework of SDIBI and the governmental offices within South Dakota that provided funding and which it served, the parties involved created SDRC, Inc. in 2009. SDRC, Inc. is a private corporation that effectively became the Applicant's management company by agreement between SDRC, Inc. and the SDIBI office.

3

Matter of SDRC Certification of Immigrant Investor Program Office Decision Benefit: Regional Center Designation, 2017 WL 1133342 (March 15, 2017). It seems to the court to be inaccurate to state that "the parties involved" created SDRC, Inc. In fact, SDRC, Inc. was and is a for-profit South Dakota corporation and it appears that Mr. Bollen, at least for most of its existence, was the sole stockholder and officer. Thus, it appears that Mr. Bollen, in connection with the transaction between SDRC, Inc. and SDRCI was, for all practical purposes, "contracting" with himself. Mr. Bollen denies ever having profited financially from SDRC and there is no apparent reason to dispute that. However, matters appear to have changed radically when the EB 5 program went from a quasi-government program (SDRCI) to a for-profit "private" corporation (SDRC, Inc.) with no apparent supervision from either the state or the federal government. SDRC received very large sums of money (millions of dollars), either directly or through a subsidiary. All facts as to what happened with SDRC, as well as funds received and funds disbursed, are not yet a matter of record, at least to the knowledge of this court. In the normal course of enforcing guarantee agreements as to a valid debt, such questions would have no relevance. Here, however, matters of equity are intertwined with possible violations of South Dakota law as to liability or non-liability of members of a limited liability company.

    As I went through the tangle of paperwork in this case, including the offering memorandum, different limited partnerships, limited liability companies, management agreements, consulting agreement, agreements as to loan origination fees, escrow agreements, personal guarantees and pledge agreements, credit agreements, forbearance agreements, government or development company agreements for aid to entities involved with the Black Hills investment and arrangements between and among the various entities, as well as the creation of and management of SDRC, Inc., I am reminded of the words of the lyrical Tevye from "Fiddler on the Roof", that these matters would be "enough to cross a Rabbi's eyes."

    In obtaining foreign EB-5 investors involved in the present case, an offering memorandum was used. The EB-5 program was explained in part: "Under the Program, the investor is required to be an 'active participant' in the management of the commercial enterprise, but such participation in connection with the activities of a limited partnership is subject to limitations set out in the relevant legislation. Notwithstanding such limitations, limited partnerships have been recognized as appropriate investment vehicles under the Program." No

explanation was given as to who recognized what. Later, in the same document, it is stated: "Under the laws of South Dakota, in order to maintain their limited liability, limited partners of the limited partnership may not take part in the management or control of the limited partnership." There was no discussion about South Dakota law as to Limited Liability Companies despite the fact that the loan was to be made to a Limited Liability Company, Tentexkota, LLC.

Articles of Incorporation for SDRC, Inc. ("SDRC"), a for-profit business corporation, were filed with the Secretary of State on January 10, 2008, the sole incorporator being Mr. Bollen. The office address was 405 8th Ave. NW, Suite 330, Aberdeen, SD 57401. The Articles and the consent to act as registered agent were signed by Mr. Bollen as president on January 3, 2008. SDRC was the private entity then administering the EB-5 program in South Dakota. Mr. Bollen was and is at least a "part-owner" and manages the corporation. The name of any other stockholder, officer or director of SDRC is unknown to the court. "Owner" refers to stockholders since an individual may not, of course, "own" a corporation. Mr. Bollen denies ever having profited financially from SDRC. I fail to understand this contention since SDRC received large sums of money, either directly or through a subsidiary.

One of the annual reports for SDRC was signed by Mr. Bollen as president on December 28, 2008, showing that Mr. Bollen was the president, secretary and treasurer. A statement of change" was filed on April 7, 2009, and returned to Hanul Professional Law Corp. in Los Angeles, CA. The change in registered agent was from Mr. Bollen to James J. Park, shown to be the president of SDRC. The address remained the same. Amended Articles of Incorporation were filed on June 1, 2009, and returned to Aberdeen attorney Jeffrey Sveen. The address of the corporation was changed to 1201 N. Main Street in Aberdeen, SD and Mr. Bollen was named as the registered agent. Mr. Bollen signed the document without any indication as to his corporate officer status. Mr. Bollen filed the annual report for SDRC, Inc. on December 8, 2009, as president. On December 6, 2009, Mr. Bollen signed the statement of change of registered office or registered agent or both, changing the address to 416 Production Street North, Aberdeen, SD. He showed the new address as well in the annual report filed on January 11, 2011. Another annual report was filed on January 6, 2012, showing Mr. Bollen as president and Pyush Patel of 128 Stillwater Trace, Griffin, GA 30223, was vice president. The annual report filed on January

5

3, 2013, showed the same information, as did the annual report filed on January 9, 2014, the annual report filed on January 12, 2015, and the annual report filed on January 7, 2016.

Also on January 10, 2008, (the date of the filing of Articles of Incorporation for SDRC, Inc.,) the Articles of Organization for SD Investment Fund LLC1 ("LLC1") and SD Investment Fund LLC2 ("LLC2") (a third party defendant in this lawsuit) were caused to be filed by Mr. Bollen who showed himself as the organizer, member manager, president, and registered agent of the two limited liability companies. Those entities were formed under the South Dakota Limited Liability Company Act, SDCL Chapter 47-34A. Mr. Bollen has apparently continued to be the member manager for each year thereafter. Mr. Park was briefly listed as the registered agent and president of LLC1 in 2009.

Also on January 10, 2008, domestic certificates of limited partnership for SDIF Limited Partnership 1 ("LP1") and SDIF Limited Partnership 2 ("LP2") (the plaintiff in this lawsuit) were filed in the office of the South Dakota Secretary of State. Those partnerships were formed under the South Dakota Limited Partnership Act, SDCL Chapter 48-7. The initial filings stated that the general partner of LP1 was LLC1. Joop Bollen signed the LP1 filing as president of LLC1 and he was also named as registered agent of LP1. A certificate of cancellation was filed on behalf of LP1 on July 22, 2016.

The initial filings on January 10, 2008, stated that the general partner of LP2 was LLC2, a wholly owned subsidiary of SDRC, Inc. Joop Bollen signed the LP2 filing as the president of LLC2 and he was also named as the registered agent of LP2.[2]

LLC2 is a wholly owned subsidiary of SDRC, Inc. LLC2 is the general partner of LP2. Normally, a lawsuit on behalf of a limited partnership would be filed by its general partner but that is not the case here.

Other entities were formed to utilize the EB-5 program in South Dakota but these are not material as to the present lawsuit.

A third proposed amendment to SDIBI's regional center application was submitted to the USCIS, requesting approval to, *inter alia,* expand the geographic area of the regional center to encompass 63 counties in South Dakota, excluding the cities of Rapid City, Aberdeen, and

---

[2] This was signed by Bollen on March 1, 2008. He was also named as the registered agent by his signature on March 1, 2008. I fail to understand these dates which are after the filing in January of 2008.

6

Watertown, to add additional target industry economic clusters, to change the name of the regional center to the South Dakota Regional Center, and to recognize the memorandum of understanding between SDIBI and SDRC, Inc. The USCIS approved those amendments in an undated letter which extensively sets forth the records SDRC, Inc. would be required to keep and provide to the USCIS, if requested.

One of the projects undertaken by SDRC, Inc. to fund with foreign capital under the EB-5 program was called the Deadwood Mountain Grand Hotel, Casino & Event Center in Deadwood, South Dakota. That project was being built partially through the investment of eight members in a limited liability company known as Tentexkota, LLC. Articles of Organization for Tentexkota, LLC ("Tentexkota") were filed by the South Dakota Secretary of State on November 26, 2006, and these Articles have been a matter of public record ever since. As set forth in more detail below, foreign investors were solicited to invest funds in LP2 for the purpose of making a loan to Tentexkota to fund the casino and event center project.

James J. Park, a lawyer with the Hanui Professional Law Corporation, was the lawyer representing the foreign investors in connection with their investments in LP2 and the loans made by LP2 for the Tentexkota casino and event center project. Mr. Park, as set forth above, was also directly involved in SDRC (including being president at one time). In addition, Mr. Park and Mr. Bollen formed LP2 and LLC2, the general partner of LP2.

An offering memorandum to the foreign investors was used. As set forth previously, the offering memorandums used to solicit foreign investors in a project were prepared by Hanul. The EB-5 program was explained in part in the offering memorandum: Under the Program, the investor is required to be an active participant in the management of the commercial enterprise, but such participation in connection with the activities of a limited partnership is subject to limitations set out in the relevant legislation. Notwithstanding such limitations, limited partnerships have been recognized as appropriate investment vehicles under the EB 5 Program. As set forth previously, the USCIS had approved an amendment to the regional center's business plan to allow the use of pooled investments in limited partnerships and a copy of that letter was part of the offering memorandum. Later, in the offering memorandum, it is stated: Under the laws of South Dakota, in order to maintain their limited liability, limited partners of the limited partnership may not take part in the management or control of the limited partnership.

7

The LP2 limited partnership agreement described the general partner, LLC2, as "a South Dakota limited liability corporation who is a wholly owned subsidiary of SDRC, Inc., a promoter and facilitator of SDRC EB-5 projects." The description of LLC2 was a misnomer because LLC2 is not a corporation under SDCL Chapter 47-1A but is instead a company under SDCL Chapter 47-34A.

The offering memorandum included an undated and unsigned copy of a consulting agreement between SDRC and LLC2 as the general partner representing LP2. That consulting agreement sets forth that SDRC was responsible for, *inter alia*, conducting due diligence investigations as to Tentexkota and on the casino and event center project, provide accounting services after loan disbursement, and to monitor job creation and other USCIS compliance requirements. LLC2 was to provide other services to LP2, including organizing, coordinating and syndicating with Project general partners (although, as we know, the project was owned by a limited liability company, not a limited partnership) for establishing the SDRC EB-5 Project for Investors (i.e. each of the foreigners), as well as monitoring and communicating on behalf of the foreign investors to ensure successful operation of the Project (the casino and event center) and negotiating and representing Investors' interest throughout the life of their investments.

Pursuant to the consulting agreement, SDRC was to receive 1% of the total amount of the "investment from the Borrower receiving the loan" at settlement but not to be paid from the proceeds of the loan. This is somewhat confusing. With the members of Tentexkota contributing $10,150,947.00, that 1% would be $101,509.47 paid to SDRC. If you applied the 1% to the foreign investors contributions of $32,500,000.00, SDRC would have received $325,000.00 at the loan closing.

Sixty-five foreigners made investments in LP2. Hanul prepared subscription and partnership agreements to facilitate the investments. Each foreign investor paid $500,000.00 for a one unit interest in LP2. In addition, each foreign investor also paid $45,000.00 "to pay for issue expenses, itemized as legal, accounting, printing, escrow expenses and third party commissions." The total amount paid for such expenses would thus be $2,925,000.00 paid to LP2 or more correctly its general partner, LLC 2

LLC 2 is the general partner of LP2. The subscription agreement deals with the $45,000.00 paid for each unit: "In the event that such issue expenses, including legal,

8

accounting, printing and escrow expenses and third party commissions, are more than $45,000 per Unit, the excess will be borne by the General Partner and in the event that such issue expenses are less than such amount, the different (sic) will be paid to the General Partner." Again, the general partner was and is LLC 2, a wholly owned subsidiary of SDRC, a for-profit corporation controlled by Mr. Bollen.

The limited partnership agreement for LP2 provides in 15.4: "No Returns of Capital. No Limited Partner is entitled to any reimbursement his (sic) contribution to the capital of the partnership except as fund (sic) or other property are available for distribution pursuant to Section 15.2 and Article 9." A question is thus raised: if funds are recovered on the personal guarantees from the members of Tentexkota, LLC, who is to receive those funds?

The offering agreement for the foreign investors states that any loan proceeds would be secured by a first mortgage on the property "as well as a personal guarantee issued by <u>partners</u> (emphasis supplied) of the Funded Business, a company with a combined net worth in excess of $100,000,000.00." This, of course, was in error since the proposed borrower was not a partnership and had no "partners." The South Dakota law as to limited partnerships had no application to the borrower, Tentexkota LLC.

All the foreign investors received their visas as promised

The limited partnership agreement in LP2 calls for LLC2 to be paid a ▯management fee" of $5,000.00 per year for each unit of the partnership. That would be $325,000.00 per year going to LLC2 (from LP2) and ultimately to SDRC. The court assumes some or all of those annual fees have been paid.

There was an escrow agreement calling for a fee of $2,500.00 per unit to be paid to SDRC as the escrow agent. This would be a total of $162,500.00 going to SDRC. SDRC was also granted "full authority" to "utilize and release the Management Fee ($45,000 per investor)" to "appropriate parties (recruiters, marketing firms, accounting firm, etc.) as it sees fit." There were no controls over the use of the $2,925,000.00 paid by the foreign investors in addition to the escrow funds. What became of those funds is unknown to the court.

The LP2 was also required to pay all litigation expenses incurred by LLC2 and SDRC and to indemnify and hold harmless such entities.

9

LP2 was also to receive 2% "of interest on the loan per annum paid by the Borrower" for five successive years. Apparently, this was computed based on the amount of interest paid by Tentexkota each year. Tentexkota claims to have paid interest of more than $6,768,206.55 and 2% of that amount would be $135,364. I do not know how this amount was computed or whether such percentage was ever applied or received or, if received, where it went.

The consulting agreement also called for SDRC to receive 1% of interest on the loan per annum" for five successive years. Combining the amount described in the previous paragraph with the 1% tells us that the Borrower was to pay a total of 3% of interest on the loan for five successive years. I do not know whether these percentages were ever applied and, if so, to what amounts of money. Nor do I know where the money, if paid, went.

As contemplated by the offering to the foreign investors, Tentexkota initially borrowed $28 million from LP2 to fund the Black Hills project. Tentexkota executed a promissory note dated April 28, 2010, agreeing to pay the $28,000,000.00 with interest at the rate of 4.5% per annum. The credit agreement between Tentexkota and LP2 was amended April 4, 2011, to add an additional debt of $4,500,000.00 to the previous loan of $28,000,000.00.

The investors in Tentexkota invested a total of $10,150,947.00 and Tentexkota received loans from LP2 totaling $32,500,000 to fund the Black Hills project. The land was purchased for $3,100,000.00. Whatever happened to the real and personal property is unknown to the court although it is certain that no foreclosure on the real estate or taking of the secured personal property has occurred.

Tentexkota and the City of Deadwood through its Business Improvement District #7 signed an agreement whereby the City was to pay Tentexkota $550,000.00 per year for 15 years to operate and market what was called the event center. I do not know what became of such contract. The offering memorandum to the foreign investors stated that Tentexkota would be paid $300,000.00 for 15 years by the Business Improvement District and also listed the $550,000.00 per annum obligations. Whether there were two such obligations or one or none is unknown to the Court.

Borrower, Tentexkota, agreed to pay (and, I assume did pay) a 1% origination fee in connection with the loan of $28,000,000.00. Thus, that fee was $280,000.00 that went to the lender, the plaintiff in this law suit, and ultimately to SDRC. The amended credit agreement,

10

which was not executed until June 22, 2011 (2 ½ months after the "amendment to credit agreement" authorized Tentexkota to borrow an additional $4.5 million) also provided for a 1% origination fee for the additional $4.5 million borrowed.

The foreign investors in LP2 were advised in writing that personal guarantees of the debt of Tentexkota would be obtained from members of Tentexkota. Tentexkota entered into a credit agreement dated April 28, 2010, with LP2. The credit agreement and amended credit agreement between Tentexkota and LP2 provided in section 1.10: "Personal Guarantees. Each Member of Borrower shall execute, enter into and deliver to Lender prior to the funding of the Loan, or any applicable installment thereof, an Unconditional Guarantee and Indemnity in the form and substance satisfactory to Lender and its legal counsel (collectively referred to herein as the "Guaranty")." Article 2.1 states: "Organization and Good Standing of Borrower. Borrower is a South Dakota limited partnership, (emphasis supplied) duly organized, validly existing and in good standing under the laws of the State of South Dakota, and is authorized to do business in each state in which the nature of its business requires that it be so licensed." Much of this was not true since Borrower was never anything but a limited liability company under the S.D. Limited Liability Company Act, SDCL 47-34A. Some of the provisions of LP2 thus misrepresented items to the foreign investors as to the business form of the borrower. Questions should be addressed as to whether LP2 and its general partner have conflicts of interest with the foreign investors who are not parties to this lawsuit.

The members of Tentexkota signed guarantee and pledge agreements both for the original loan and for the second loan wherein they personally guaranteed to pay the indebtedness of Tentexkota. Those guarantee and pledge agreements form the basis of LP2's collection action against the individual defendants.

Tentexkota fell into default and Tentexkota and some of the guarantors entered into a forbearance agreement with LP2 on June 19, 2015, agreeing to pay $1.5 million for accrued interest and late fees within 60 days. There is no genuine issue of material fact that Tentexkota is in default of the loan agreements and the subsequent forbearance agreement. LP2 served a notice of default on May 11, 2016. Interest accrues thenceforth at the rate of 12% per anum on the unpaid debt.

11

Tentexkota and its members admit that Tentexkota executed promissory notes and defaulted on those notes. The members admit that they signed guarantee and pledge agreements to personally guarantee the payment of Tentexkota's loans from LP2. The members contend, however, that the guarantee and pledge agreements were void as a matter of law because the guarantees ensured the foreign investors would be paid a return on their investment. The members contend that the foreign investors' investments were therefore not "at risk" as required by the USCIS regulations for the EB-5 investment program. If the guarantees are ultimately found to be void, the foreign investors would be very much at risk.

What no party failed to notice or advise the Court was the fact that each guaranty included, at section 5(a), a provision that "[t]he execution, delivery, and performance by Guarantor of this Agreement will not violate any provision of law . . . ." As will appear below, such statement may have been false.

Article Six of the Tentexkota Articles of Organization, dealing with debts and obligations, provides: "No members of the company are to be liable for its debts and obligations pursuant to SDCL 47-34A-303(c)." These Articles have never been amended, or at least no amendments have ever been filed with the South Dakota Secretary of State. SDCL 47-34A-303 has at all times provided:

> (a) Except as otherwise provided in subsection (c), the debts, obligations, and liabilities of a limited liability company, whether arising in contract, tort, or otherwise, are solely the debts, obligations, and liabilities of the company. A member or manager is not personally liable for a debt, obligation, or liability of the company solely by reason of being or acting as a member or manager.
>
> (b) The failure of a limited liability company to observe the usual company formalities or requirements relating to the exercise of its company powers or management of its business is not a ground for imposing personal liability on the members or managers for liabilities of the company.
>
> (c) All or specified members of a limited liability company are liable in their capacity as members for all or specified debts, obligations, or liabilities of the company if: (1) A provision to that effect is contained in the articles of organization, and (2) A member so liable has consented in writing to the adoption of the provision or to be bound by the provision.

The statute was a part of a uniform law. Other states have amended the statute.

It is unknown whether anything "came up" about this South Dakota statute in connection with negotiations or execution of any or all of the various documents. The South Dakota Supreme Court has never been called upon to interpret the statute other than in connection with costs and fees awarded in arbitration (which the Court did not permit as to members). *See* Black Hills Surgical Physicians, LLC. v. Setliff, 855 NW2d 407 (2014).

Such statute clearly provided and provides that members are not to be liable for debts, obligations, and liabilities of the limited liability company solely by reason of being or acting as a member or manager and that members may be liable for company debts if a provision to that effect is contained in the Articles and a member so liable has consented in writing to the adoption of the provision in the Articles providing for personal liability.

As set forth previously, Tentexkota entered into a credit agreement dated April 28, 2010, with LP2 which provides, at section 2.1 (a part of the warranties section), that the borrower "is a South Dakota Limited Partnership . . ." This is false since the borrower was a limited liability company under the S.D. Limited Liability Company Act, SDCL 47-34A. The S.D. Uniform Limited Partnership Act, codified at SDCL 48-7, does not contain any provision similar to SDCL 47-34A-303 limiting the liability of the partners (except as to judgment creditors).

In this same credit agreement, section 2.2 provides that the "entry into . . . the Security Documents by Borrower and its performance has been approved by all necessary action, including the approval of its members and managers in accordance with its Articles of Organization, Operating Agreement, and the laws of the State of South Dakota." The term "Security Documents" is defined in section 1.4 to include "each Guaranty." It is not true that the Articles of Organization of Tentexkota, LLC. were ever amended to comply with South Dakota law.

The credit agreement, in section 5, states that a condition precedent to the obligation of SDIF to make the loan is that SDIF "shall have received . . . the Articles of Organization" and a copy of "the resolution of the Members and Managers of Borrower authorizing . . . the execution . . . of . . . the Security Documents . . ." I have seen nothing in the records to show that any of this was done.

One or more of the parties may contend that I have not correctly recited the history of these transactions and, if so, I invite such parties to bring such contentions to the attention of the court. I want to avoid being trapped in the maze of business entities.

13

## DECISION

LP2 loaned a total of $32.5 million to Tentexkota. Tentexkota made payments on the promissory notes for a period of time but went into default on the notes. The loans were personally guaranteed by the members of Tentexkota. LP2 filed suit seeking to collect the debts of Tentexkota, based on personal guarantees signed by members of Tentexkota.

Tentexkota and its guarantor members filed suit seeking a declaratory judgment against Bollen, SDRC, Inc., LP2, LLC2, and the John Doe defendants (presumably the foreign investors) that the personal guarantees and pledge agreements are void because they violate the "at risk" requirement of the EB-5 visa program and are therefore void as contracts against public policy pursuant to SDCL 53-9-3 and are also void due to lack of consideration. Further, Tentexkota and its guarantor members seek a declaratory judgment that LP2 is estopped from enforcing the personal guarantees and pledge agreements because they relied upon Bollen's misrepresentations that personal guarantees were required by the EB-5 program. Finally, Tentexkota and its guarantor members seek a declaration that Bollen and the entities waived any right to enforce the personal guarantees and pledge agreements by inconsistent representations to the USCIS that the money invested by the alien investors was done so in compliance with the EB-5 visa program prerequisites.

The separate law suits have been consolidated with the collection action proceeding as the main case and the declaratory judgment action proceeding as a third party claim.

Pending before the Court are a motion by the third party defendants to dismiss the third party claim based upon the contention that the third party defendants were not parties to the loan agreements at issue in this collection action, a motion for summary judgment by the plaintiff, and a motion filed by the defendants/third party plaintiffs to conduct discovery.

No party pointed out the significant errors in the documents supporting the loan and guarantees at issue in this litigation and no party briefed the application of SDCL 47-34A-303 in this litigation. Likewise, no party briefed or cited SDCL 53-9-1: "A contract provision contrary to an express provision of law or to the policy of express law, though not expressly prohibited or otherwise contrary to good morals, is unlawful." A decision on this matter is a matter of law for the court, subject, of course, to abuse of discretion. The court must decide whether the guarantee agreements were supported by adequate consideration and, if so, whether the written guarantees nevertheless violate SDCL 47-34A-303. Questions of possible violations of public policy also exist.

There is no genuine issue of material fact that Tentexkota borrowed $32.5 million from LP2 and signed promissory notes to repay the principal plus interest. There is no genuine issue of material fact that Tentexkota defaulted on its loans from LP2. As a matter of law, LP2 is entitled to a judgment against Tentexkota for $32.5 million plus interest.

Genuine issues of material fact exist as to the validity of the personal guarantee and pledge agreements, precluding summary judgment at this time, and the motion for summary judgment should be denied as to the claims against the individual defendants.

Questions of public policy and matters of equity are present in this lawsuit. It may be relevant as to who drafted the various documents and whether all parties were represented by counsel.

Under the facts and issues of this case, the motion to dismiss should be denied.

The motion of the various parties to be permitted to conduct discovery should be granted and the parties should proceed with the meeting required by the Federal Rules of Civil Procedure followed by the required report.

Now, therefore,

IT IS ORDERED:

1. The motion, Doc. 19, by the third party defendants to dismiss the third party declaratory judgment claims is denied.

2. The motion, Doc. 24, by the plaintiff for summary judgment on the collection claims as to Tentexkota is granted as to a partial summary judgment as to liability only.

3. The motion, Doc. 24, by the plaintiff for summary judgment on the collection claims as to the individual defendants is denied.

4. The motion, Doc. 28, by the defendants and third party plaintiffs to conduct discovery is granted.

DATED this 5th day of September, 2017.

BY THE COURT:

*Charles B. Kornmann*

CHARLES B. KORNMANN
United States District Judge

15