UNITED STATES DISTRICT COURT
DISTRICT OF SOUTH DAKOTA
NORTHERN DIVISION

| | |
|---|---|
| SDIF LIMITED PARTNERSHIP 2, a South Dakota Limited Partnership,<br><br>Plaintiff,<br><br>vs.<br><br>TENTEXKOTA, LLC, a South Dakota Limited Liability Company, W. KENNETH ALPHIN, TIMOTHY J. CONRAD, MICHAEL R. GUSTAFSON, GEORGE D. MITCHELL, DALE MORRIS, MARC W. OSWALD, RONALD W. WHEELER, and DWIGHT P. WILES,<br><br>Defendants and Third Party Plaintiffs,<br><br>vs.<br><br>JOOP BOLLEN, SDRC, INC., SD INVESTMENT FUND LLC2, and JOHN DOE 1-75,<br><br>Third Party Defendants | 1:17-CV-01002-CBK<br><br>OPINION AND ORDER |

## BACKGROUND

On September 19, 2018, SDIF Limited Partnership 2 ("SDIF") filed a motion for summary judgment to enforce personal guarantees signed by defendants for loans made to Tentexkota, LLC ("Tentexkota"). Defendants and third party plaintiffs ("defendants") filed cross-motions for summary judgment. Third party defendants also filed a cross-motion for summary judgment. Plaintiffs argue that summary judgment is warranted as there is no issue of material fact that Tentexkota is in default on plaintiff's loans. Defendants argue that the personal guarantees violate

SDCL § 47-34A-303 and are therefore unenforceable; that the personal guarantees violate the requirement that EB-5 capital contributions be put "at risk"; and that plaintiff is estopped from enforcing the personal guarantees based upon representations made by third party defendant Joop Bollen. Third party defendants allege that, since no claims are being made against them, summary judgment is warranted as to their inclusion in this dispute. Defendants counter that third party defendants induced them to sign personal guarantees for loans made to Tentexkota. For the reasons stated below, this Court denies plaintiff's and defendants' motions for summary judgment and grants third party defendants' motion for summary judgment.

## DECISION

### I. Standard of Review

The purpose of summary judgment is to determine whether there is a "genuine issue for trial" with regard to a claim or defense or "part of each claim or defense." Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986); Fed. R. Civ. P. 56(a). Summary judgment should be granted only where there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). If facts are disputed, "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). The moving party bears the burden of showing that the material facts in the case are undisputed and "inferences to be drawn from the underlying facts . . . must be viewed in the light most favorable to the party opposing the motion." Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986); United States v. Diebold, Inc., 369 U.S. 654, 655 (1962) (per curiam). However, a nonmoving party "may not rest on mere allegations or denials" and "must do more than show that there is some metaphysical doubt as to the material facts." Anderson at 256; and Matsushita at

587. In sum, an issue of fact is genuine if, based upon the evidence in the record, a reasonable jury could return a verdict for the nonmoving party. Anderson at 248.

**II. The Court Has Addressed the "At Risk" Requirement for EB-5 Capital Contributions**

Defendants argue that the personal guarantees violate the requirement that EB-5 capital contributions be put "at risk." This is the same argument the Court addressed in its June 19, 2018, Order denying defendants' motion to compel. That defendants are raising this argument again belies the weakness of their position. The arguments raised in support of renewing this assertion are myriad and meritless: these include the testimony of Joop Bollen ("Bollen") that USCIS was "adamant in their attempt to apply new rules retroactively"; that Bollen stated the USCIS EB-5 approval office, staffed with "ex-military" members, was not capable of effectively managing the EB-5 program; the fact that the limited partners have hired an attorney; that it is unclear whether the Offering Memorandum ultimately submitted to USCIS referenced personal guarantees; and that the collateral backing the guarantees consists of government bonds and IRA accounts. Although the Court need not address these arguments—given that it has already ruled on the validity of the personal guarantees in conjunction with the "at risk" requirement—because the defendants' statements are immaterial, this Court will address them in turn.

In referring to the "new rules" Bollen alleges the USCIS attempted to apply retroactively, defendants assert that Bollen knew that if USCIS were aware of the alleged strength of the guarantees it would have denied the investors' visa applications. There is no support for this statement either in the evidence cited by defendants or in Bollen's deposition. Rather, it is clear to this Court that the "new rules" Bollen refers to are the USCIS's revisions to the economic analysis calculations investors were required to submit as part of their visa petitions to demonstrate that, as required by the EB-5 visa program, their investments "have created or will create at least 10 full-

3

time positions for qualifying employees." (Doc. 115, Ex. 1). As the USCIS admits in its Request for Evidence dated March 27, 2015, investors relied on a June 25, 2008, letter from the USCIS to Bollen stating that investors "need not show that the new commercial enterprises created ten new jobs indirectly," but that, in fact, "[c]ontrary to USCIS's statements in the June 25, 2008, letter, petitioners must show that the requisite number of jobs have been or will be created within a reasonable time. . . ." *Id.* The letter then discusses econometric methods to calculate job creation. Defendants have submitted no evidence to suggest that USCIS has revised its rules regarding analysis of risk. The 2013 USCIS Policy Memorandum provides no new analysis of risk that the Court has not already addressed in its prior order. (Doc. 187, Ex. 1).

Whom USCIS hires to adjudicate its EB-5 visa applications and Bollen's opinion of such individuals is no business of the Court.

Defendants also attempt to argue that, because some of the limited partners hired an attorney to assist them in reviewing the status of their investment, and that that attorney then initiated litigation on behalf of the limited partners, this nullifies the risk in their debt arrangement. The 2013 USCIS Policy Memorandum submitted by defendants states that an agreement between a new commercial enterprise and immigrant investor which "provides that the investor may demand return of or redeem some portion of capital after obtaining conditional lawful permanent residence . . . is not at risk." (Doc. 187, Ex. 1). As the Court previously noted in its June 19, 2018, Order, neither the Guaranty and Pledge Agreements nor the Limited Partnership Agreement contain language that allow the immigrant investors to demand returns of their investments. To

suggest that the limited partners should have no access to legal representation to recoup their investment defies common sense.[1]

Next, defendants argue that it is unclear whether the Offering Memorandum ultimately submitted to USCIS referenced personal guarantees. As support for this statement, defendants refer to an offering memorandum for SDIF LP 2 that does not mention personal guarantees, the ultimate loan amount secured, or issuance expenses, citing (referring, this Court notes, to the incorrect page numbers) Bollen's deposition that such offering memorandum "is not the final Offering Memorandum," "is a draft," that he doesn't "recall this version," and that he doesn't "think this OM [offering memorandum] was ever used" to support the statement that it is unclear which offering memorandum was submitted to USCIS for approval of SDIF LP2. (Doc. 187, Ex. 2). Support for this allegation, given Bollen's denial that the offering memorandum in dispute was used to promote the project, is extremely weak. Moreover, as this Court noted in its prior decision, numerous documents provided to USCIS mention the guarantees, including repeated references in the Amended Credit Agreement and Tentexkota's Financial Statements and Independent Auditor's Report.

As further support, defendants cite a Notice of Intent to Terminate issued by USCIS to SDRC, Inc., which states concerns with "inaccurate or incomplete information" provided to USCIS on the Regional Center's "annual Form I-924A." (Doc. 198, Ex. 1). The Form I-924A is used "by approved regional centers to certify and demonstrate their continued eligibility for the regional center designation." *Instructions for Annual Certification of Regional Center*, USCIS, OMB No. 1615-0061. It is not the form used for the initial designation of the regional center under

---

[1] Defendants cite to an Ashenberg Deposition for additional factual support. No such deposition was filed in the Affidavit supporting defendant's motion. (Doc. 187).

5

the Immigrant Investor Program or for the addition of a new commercial enterprise associated with the regional center. *I-924, Application for Regional Center Designation Under the Immigrant Investor Program*, USCIS (Nov. 9, 2018), https://www.uscis.gov/i-924. The I-924A requires submission of information regarding the resulting aggregate capital investment and job creation of the regional center's investments. It also requires submission of information regarding the number of approved and denied immigrant investor visa applications. Form I-924A is clearly intended not to evaluate the risk of a proposed commercial enterprise but rather to ensure that such enterprise is having the job creating impact required by the EB-5 program to retain its eligibility as a regional center. This is consistent with the concerns raised in the Notice of Intent to Terminate issued by USCIS to SDRC, Inc., which states that "USCIS has discovered . . . that the Regional Center may no longer be able to promote economic growth," that SDRC, Inc., "violated the terms of escrow agreements with investors," and that the USCIS misrepresented "the job-creating activities to be facilitated by EB-5 investments" and the particular "NCE under [SDRC, Inc.'s] sponsorship."

This Court notes that USCIS does state that investor petitions submitted as part of the EB-5 visa application "include questionable documents that appear to have been visibly altered and that did not have the signatures of the legitimate parties." USCIS cites petitions submitted by investors in which the financial documents, such as escrow and subscription agreements, listed different limited partnerships as investment vehicles for loans made by various petitioners, and alleges that SDRC, Inc., may have moved investors between NCEs. These concerns, as with the other concerns raised by USCIS with regard to the Form I-924A filings, are relevant to the job-creating impact of the regional center and are not relevant to whether investments made by each limited partnership were at risk. USCIS does not specifically raise concerns about SDIF LP2 in the analysis relevant to petitioner's visa applications. It is no secret to this Court or any citizen in

South Dakota with access to a newspaper that SDRC, Inc. and Joop Bollen have been investigated for questionable banking practices and tax evasion. Indeed, Bollen was prosecuted in state court and received probation as a result of such investigations. SDRC, Inc.'s unorthodox banking practices and South Dakota's maturity with regard to regulating foreign direct investment have been addressed extensively elsewhere and are not on trial here. There is no indication in the documents provided by defendants and the Court has no reason to believe that the USCIS has ever questioned whether fraudulent misrepresentations regarding the personal guarantees executed by defendants were made in the process of designating SDIF LP2 as a new commercial or job-creating enterprise under the Immigrant Investor Program. That is, defendants have not demonstrated that there is more than metaphysical doubt—or that there is any doubt—as to the documents submitted to USCIS to designate SDIF LP2 as a job creating entity under the Immigrant Investor Program.

I do not condone what happened between Mr. Bollen and others, including state government officials. These people created or allowed to be created a situation where the EB-5 Program (which was to be used to benefit South Dakota state government) was, all of a sudden, turned over to a for-profit corporation. That corporation received large fees. The initial "fees" which went to Mr. Bollen's corporation were $45,000 from each of the 65 investors for a total of $2,925,000. Other feees are outlined in this Court's prior opinion dated March 2, 2017, and are fully documented in the record of the present case. But neither Mr. Bollen nor his corporation nor South Dakota officials are on trial here for such activities.

Defendants finally argue that the collateral backing the guarantees consists of government bonds, IRA accounts, and "other solid investments." In its June 19, 2018, Order, the Court cited (as a rationale that personal guarantees do not obviate risk in a loan transaction) a legal opinion published by the then-INS Office of the General Counsel, which stated that

7

> It is therefore clear that, unless the third-party guarantee is supported by collateral unconditionally backed by the full faith and credit of the federal, state or municipal government (e.g., U.S. Treasury obligations or municipal bonds placed in escrow), an alien investor cannot be entirely certain that he will be able to recover his capital investment in the event the guarantor becomes financially insolvent or incapable of meeting its third-party contractual obligation to the investor.

The "government bonds" and "IRA accounts" cited by defendants hardly rise to the species of unconditional collateral—such as municipal bonds *placed in escrow*—envisioned in the General Counsel's opinion. There is no evidence in the tax filings that defendants have provided that any of the municipal bonds held by guarantors were used as collateral for their personal guarantees or that such bonds were placed in escrow as security for such guarantees. Defendants fail to cite language in the same opinion, also quoted by the Court, that "[t]he strength of the third-party guaranty depends on a wide variety of factors, including . . . the extent the underlying investment fails. . . ."

As a final matter, the affidavit of defendants' respected expert, Donald Frankenfeld, incorrectly relies on the USCIS's decision in Izummi, and is in any case inapposite—the Court may not rely on an economist to construe legal precedent—is as irrelevant now as it was when the Court drafted its first opinion on this issue.

### III. The Court Should Certify Questions Related to SDCL 47-34A-303(c)

The parties do not dispute that there is no controlling precedent in South Dakota determining whether SDCL 47-34A-303 would invalidate personal guarantees signed by members of an LLC in their capacity as members where the LLC has not amended its articles of organization to provide for this outcome and the members have not otherwise consented in writing to the adoption of such a provision. Where there is "no state law precedent on point and where the public policy aims are conflicting" a legal question "may properly be certified to the state court." Hatfield,

8

by Hatfield v. Bishop Clarkson Memorial Hosp., 701 F.2d 1266, 1267 (8th Cir. 1983). Whether a federal court certifies a question to a state court "is a matter of discretion." Johnson v. John Deere Co., a Div. of Deere & Co., 935 F.2d 151, 153 (8th Cir. 1991). However, "[u]nsettled questions of state law are best left to the states." Poage v. City of Rapid City, 431 F.Supp. 240, 246 (D.S.D. 1977). As the issues raised here are unsettled in South Dakota and as there are public policy concerns regarding both invalidating the personal guarantees and holding LLC members *qua* members accountable for the LLC's debts, this Court determines that questions related to the operation of SDCL 47-34A-303 should be certified to the South Dakota Supreme Court.

The Court also declines to grant partial summary judgment against non-member or "indirect member" guarantors pending response from the South Dakota Supreme Court. In effect, plaintiffs request that this Court enter final judgment against the non-member guarantors in light of the Court's prior holding that plaintiffs are entitled to a judgment against Tentexkota for $32.5 million plus interest as a matter of law. As this Court previously noted, however,

> It is left to the sound judicial discretion of the district court to determine the 'appropriate time' when each final decision in a multiple claims action" should be certified under Fed. R. Civ. P. 54(b). Curtiss-Wright Corp. v. Gen. Elec., 446 U.S. 1, 8 (1980). Moreover, "[s]ound judicial administration does not require that Rule 54(b) requests be granted routinely"; indeed, "Rule 54(b) is to be used sparingly" and "both courts and commentators have expressed the exceptional nature of a Rule 54(b) certification." Id. at 10; Jones v. West Plain Bank & Trust Co., 813 F.3d 700, 702 (8th Cir. 2015) (internal citations omitted); and Page v. Preisser, 585 F.2d 336, 339 (8th Cir. 1978).

The Court notes that all guarantees appear to include the recitation that "Guarantor, as member of Borrower" entered into the agreement. If the non-members entered into the guarantees on behalf of their corporate entities, an intent suggested by the "By" and "Its" lines on the signature pages, rather than in their individual capacities, all guarantors would then be members. There is nothing

that prohibits a personal guarantee from being signed by a corporate entity. The personal guarantees do define "guarantor" with the signatory "as an individual." Although plaintiff points out that the personal guarantees were allegedly supported by the individuals' financial statements, the parties have not otherwise provided evidence to address this inconsistency or discuss its legal consequences. As such, in "consider[ing] both the equities of the situation and judicial administrative interests, particularly the interest in preventing piecemeal appeals," the Court declines to enter final judgment against the possible non-member guarantors pending a response from the South Dakota Supreme Court on the questions certified.

If the South Dakota Supreme Court declines to answer the certification, I will, of course, decide the case.

## IV. Guarantors Were Not Induced by Bollen to Sign Personal Guarantees

Defendants argue that plaintiffs should be estopped from enforcing the personal guarantees because Bollen induced them into providing the guarantees "to get the project off the ground." Defendants argue that Bollen concealed from Tentexkota that this was the first project he had promoted requiring personal guarantees, that he was unaware of any other EB-5 projects that had personal guarantees, and that the personal guarantees were required for the purpose of securing a loan from SDIF LP2. Defendants state that they relied upon Bollen's representations to their detriment.

In order to invoke equitable estoppel defendants must show the following elements by clear and convincing evidence:

> (1) [Plaintiff] made false representations to or concealed material facts from [defendants]; (2) [Defendants] did not have knowledge of the real facts; (3) the misrepresentations or concealment was made with the intention that it should be acted upon; and (4) [Defendants] relied upon those misrepresentations or concealment to its prejudice or injury. East Side Lutheran Church of Sioux Falls

v. NEXT, Inc., 852 N.W.2d 434, 441 (S.D. 2014) (internal citations omitted).

As plaintiff points out, defendants have been unable to demonstrate that they experienced any prejudice as a result of the alleged misrepresentations. Rather, by signing the personal guarantees, defendants were able to secure two loans totaling $32.5 million without, as of yet, fulfilling the terms of their loan agreements. Indeed, the Court questions the statements that defendants cite: whether this was the first or last project Bollen promoted requiring personal guarantees has little relevance to his request for such guarantees; even if Bollen were unaware that other EB-5 programs utilized personal guarantees, as the Court has noted in its previous decision, that is nonetheless certainly the case; and, indeed, personal guarantees were required in order to secure a loan from SDIF LP2—investors requested personal guarantees as a condition to lending and had this requirement made defendants uncomfortable, they could have sought a loan elsewhere. No one is alleged to have forced defendant guarantors to sign the personal guarantees and defendants' conclusory statement that they relied on Bollen's representations to their detriment is unpersuasive.

**V. Third party defendants' motion for summary judgment**

Third party defendants' motion for summary judgment, filed October 10, 2018, was unopposed by any party. With the dismissal of defendants' estoppel claim, and reaffirmation of the dismissal of the "at-risk" argument, the only claims in defendants' amended complaint implicating third party defendants, this Court should grant third party defendants' motion for summary judgment. This Court notes that defendants made an additional claim requesting declaratory judgment regarding waiver against third party defendants; however, as should be obvious, that it is not the third party defendants who seek to enforce the personal guarantees, but rather plaintiff.

# ORDER

Now, therefore,

IT IS ORDERED:

1. Plaintiff's motion for summary judgment, Doc. 160, is denied;

2. Defendant Dale Morris' motion for summary judgment, Doc. 167, is denied;

3. Third party defendants' motion for summary judgment, Doc. 168, is granted, without the taxation of costs;

4. Defendants' motion for summary judgment, Doc. 176, is denied;

5. The motions for joinder filed as Docs. 181, 182, 184, 185, 186, 190, 201, 202, 203, and 204 are granted.

6. The telephonic hearing now set for Friday, December 14, 2018, is cancelled.

Dated this 7th day of December, 2018.

BY THE COURT:

Charles B. Kornmann

CHARLES B. KORNMANN
United States District Judge